# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | No. 3:26-CR- |
| | : | |
| **v.** | : | (Judge           ) |
| | : | |
| **JOHN FESTINO,** | : | (electronically filed) |
| **Defendant** : | | |

## INFORMATION

THE UNITED STATES ATTORNEY CHARGES:

### COUNT 1
18 U.S.C. § 1957
(Unlawful Monetary Transactions)

### I.    Introduction

At times material to the Information:

1.    Defendant JOHN FESTINO resided in Old Forge, Pennsylvania, in Lackawanna County, within the Middle District of Pennsylvania.

2.    TELECOMMUNICATIONS COMPANY is a multinational internet service provider with corporate headquarters in Washington, D.C.

3.    CUSTOMER 1 was a purchaser and reseller of telecommunications equipment. CUSTOMER 1 purchased and resold

this equipment under the name COMPANY 1. COMPANY 1 operated from Maryville, Tennessee.

4.     CUSTOMER 2 was a purchaser and reseller of telecommunications equipment. CUSTOMER 2 purchased and resold this equipment under the name COMPANY 2. COMPANY 2 operated from Alford, Florida.

5.     On or about May 1, 2023, TELECOMMUNICATIONS COMPANY acquired the U.S. long-haul fiber optic network of Sprint Communications and the related business. The acquisition included approximately 1,000 former employees of Sprint. Among those employees were field employees, who completed maintenance on and upgrades to the network.

6.     FESTINO was a field engineer for Sprint in the Scranton/Wilkes-Barre region. He had been employed in that capacity since 2011. His service area stretched from Binghamton, New York to the Maryland/Pennsylvania line—covering the Central Pennsylvania region.

7.    In that role, FESTINO received work orders from TELECOMMUNICATIONS COMPANY to complete upgrades and repairs, known as a "statement of work" ("SOW").

8.    A SOW included a bill of materials that prescribed what equipment was needed to complete the project at issue. Each SOW had a distinct SOW number.

9.    As a field engineer, FESTINO had a unique log-in and password to TELECOMMUNICATIONS COMPANY's inventory system. FESTINO would log in, input the SOW number, order the equipment needed for that SOW, and have it shipped from TELECOMMUNICATIONS COMPANY's warehouse in Sterling, Virginia to a UPS store near his residence in Old Forge, Pennsylvania. The main UPS store that FESTINO shipped equipment to was in Dunmore, Pennsylvania.

10.    Once FESTINO obtained the equipment, he would complete the SOW and otherwise service the network in his service area.

11.    Beginning in or about December 2024, FESTINO began to requisition pieces of telecommunications equipment, including

3

transponders and other associated equipment, from the Sterling, Virginia warehouse but did not install them.

12. When FESTINO logged in to TELECOMMUNICATIONS COMPANY's inventory system, he would input SOW numbers from the SOWs that he had worked on in the past and had completed several months prior. FESTINO repeatedly re-used old SOW numbers to order materials that were not needed.

13. In this manner, FESTINO fraudulently ordered equipment from TELECOMMUNICATIONS COMPANY for a period of approximately seven months.

14. Between January 2025 and July 2025, FESTINO placed at least 35 orders from TELECOMMUNICATIONS COMPANY and had those orders shipped to the UPS Store in Dunmore, Pennsylvania. The equipment in those 35 orders consisted of various telecommunications equipment, primarily transponders, which are necessary for the network's operation.

15. Transponders are electronic circuit boards. Each individual transponder is worth thousands of dollars; some are valued at over

4

$40,000.00 apiece. The majority of transponders ordered by FESTINO were manufactured by a company called Ciena.

16. In total, FESTINO requisitioned and took delivery of, but never installed, 135 transponders ("the missing transponders"), which are valued at approximately $2,245,158.80.

17. Each transponder has a distinct serial number that can be traced when the transponder is activated within TELECOMMUNICATIONS COMPANY's network. To date, none of the 135 missing transponders have been activated in TELECOMMUNICATIONS COMPANY's network.

18. On October 23, 2025, TELECOMMUNICATIONS COMPANY was notified by Ciena that seven of the transponders ordered by FESTINO had been detected in another Ciena customer's network, a certified reseller of telecommunications equipment.

19. TELECOMMUNICATIONS COMPANY cross-referenced the serial numbers of those seven transponders and confirmed that they matched the serial numbers of transponders stolen by FESTINO.

20. In or about December 2024 and continuing through July 2025, FESTINO devised a scheme to fraudulently obtain property owned by TELECOMMUNICATIONS COMPANY and resell the property to third-party buyers, specifically COMPANY 1 and COMPANY 2.

21. FESTINO advertised the sale of fraudulently obtained equipment via the internet.

22. COMPANY 1 purchased equipment from FESTINO between March and July 2025. FESTINO received approximately $299,650.00 from COMPANY 1. FESTINO directed COMPANY 1 to send the funds to FESTINO's personal bank accounts at NET Federal Credit Union, Fidelity Brokerage Services, and Netspend Corporation serviced by Pathward, N.A..

23. COMPANY 2 purchased equipment from Festino between February and July 2025. FESTINO received approximately $134,900.00 from COMPANY 2. FESTINO directed COMPANY 2 to send the funds to FESTINO's personal bank accounts at NET Federal Credit Union and Fidelity Brokerage Services.

24. FESTINO directly received the sale proceeds in his personal bank accounts. The proceeds FESTINO directly received as a result of the sales to COMPANY 1 and COMPANY 2 total approximately $434,550.00.

25. TELECOMMUNICATIONS COMPANY did not receive any proceeds from the sales of the fraudulently obtained equipment FESTINO made to COMPANY 1 or COMPANY 2.

26. FESTINO did not have permission to resell the equipment TELECOMMUNICATIONS COMPANY sent him to COMPANY 1 or COMPANY 2.

27. In late July 2025, TELCOMMUNICATIONS COMPANY discovered abnormalities with FESTINO's SOW orders.

28. On July 25, 2025, after FESTINO became aware that TELECOMMUNICATIONS COMPANY was investigating the missing equipment, he resigned from his position at TELECOMMUNICATIONS COMPANY and ceased all communication.

29. On July 26, 2025, FESTINO's former supervisor left a voicemail on FESTINO's personal cellular phone asking for his help to

7

recover the missing equipment. FESTINO never responded to the voicemail.

30. On disparate dates from on or about February 18, 2025 through on or about August 8, 2025, FESTINO conducted a series of financial transactions involving fraudulently obtained funds, including transactions of greater than $10,000.00 utilizing the funds for personal purposes.

## II. Statutory Allegation

31. On or about June 30, 2025, in the Middle District of Pennsylvania, and elsewhere, the defendant, JOHN FESTINO, knowingly engaged in a monetary transaction affecting interstate commerce, in criminally derived property of a value greater than $10,000.00, that is, the defendant did withdraw $40,000.00 in cash from his NET Federal Credit Union account ending in 7176, such property having been derived from specified unlawful activity, namely, mail fraud, in violation of Title 18, United States Code, Section 1341; and wire fraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1957.

BRIAN D. MILLER
United States Attorney

_Tatum R Wilson_
TATUM R. WILSON
Assistant United States Attorney

_6/9/26_
Date

9